**Richard SEAVER, Harold Lee Oliver, Larry Brand, Fitzpatrick Perry, David Mercier, Paul Sheehan, Michael Brace, Plaintiffs,**

v.

**Officer MANDUCO, Officer Jones, Officer Leblanc, Officer Rabbit, Officer Vachon, Officer Andrade, Officer Rice, Officer John Doe, Officer John Doe # 2, Officer John Doe # 3, Officer Richard Curtis, Lynn Bissonnette, Department of Corrections, Defendants.**

**No. CIV.A.00–10906–REK.**

United States District Court,
D. Massachusetts.

Jan. 4, 2002.

---

Richard Seaver, N.C.C.I., Gardner, MA, pro se.

Harold Lee Oliver, MCI Gardner, Gardner, MA, pro se.

Larry Brand, Worcester, MA, pro se.

Fitzpatrick Perry, MCI Gardner, Gardner, MA, pro se.

David Mercier, MCI Gardner, Gardner, MA, pro se.

Paul J. Sheehan, pro se.

Michael Brace, Bridgewater, MA, pro se.

Julie E. Daniele, Department of Correction Legal Division, Boston, MA, for Manduco.

## Opinion and Order

KEETON, District Judge.

### I. Pending Motions

(1) Plaintiffs Oliver, Seaver, Perry and Mercier's Motion to Compel (Docket No. 43, refiled in Docket No. 48 on November 26, 2001);

(2) Plaintiffs Oliver and Seaver's Motion to Supplement Complaint (Docket No. 40, filed July 5, 2001); Defendants have filed a Memorandum in Opposition (Docket No. 41, filed August 6, 2001); Plaintiffs Seaver and Oliver (signed by Seaver only) filed a Reply (Docket No. 42) that was refiled as part of Docket No. 48 on November 26, 2001 and signed by Plaintiffs Seaver, Oliver, Perry and Mercier;

(3) Defendants' Motion to Dismiss or in the Alternative, for Summary Judgment (Docket No. 25 filed April 9, 2001); Plaintiffs Seaver, Oliver, Sheehan, Harris and Mercier filed a Memorandum in Opposition (Docket No. 29) that was refiled as part of Docket No. 48 on November 26, 2001 and signed by Plaintiffs Seaver, Oliver, Harris and Mercier; and

(4) Motion by Plaintiffs Seaver, Oliver, Harris and Mercier to Amend Complaint (Docket No. 47, filed November 26, 2001); Defendants have filed a Memorandum in Opposition (Docket No. 49, filed December 12, 2001).

(5) Motion by Plaintiffs Seaver, Oliver, Mercier and Perry to Strike Defendants' Opposition (To Amend) or, in the Alternative, Plaintiffs' Reply (Docket No. 50, filed December 20, 2001). This filing has also been signed by Deshawn Teixera and Henry Houghton.

## II. Procedural Background

On March 1, 2000, plaintiffs Seaver, Oliver, Brand, Perry, Mercier, Sheehan and Brace, appearing pro se, filed a Complaint in this court requesting $25,000 in damages along with injunctive and declaratory relief under 42 U.S.C. § 1983.

On February 13, 2001, defendants, represented by counsel, filed a Motion to Stay Discovery (Docket No. 23) pending resolution of a planned dispositive motion. The court denied this motion without prejudice on March 13, 2001.

On April 9, 2001, defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment (Docket No. 25). On the same date, defendants field a Memorandum of Law (Docket No. 26) in support of this Motion. The Memorandum of Law included a Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 (Docket No. 26, p. 2). Attached to the Memorandum of Law as Exhibit A is an Affidavit of Jean Laprise that was also filed on April 9, 2001. Plaintiffs Seaver, Sheehan, and Mercier filed a Motion for Enlargement of Time (Docket No. 27, filed April 17, 2001) in order to prepare an Opposition. Plaintiffs Seaver, Sheehan, Perry, Oliver, and Mercier then filed an Opposition to Plaintiff's Motion (Docket No. 29) along with nine Affidavits (Docket Nos. 30–38) on May 22, 2001.

On July 6, 2001, plaintiffs Oliver and Seaver filed a Motion to Supplement Complaint (Docket No. 40). Defendants have filed an Opposition to Plaintiffs' Motion to Supplement Complaint (Docket No. 41 filed August 6, 2001) and plaintiff Seaver subsequently filed a Reply to Defendants' Opposition to Supplement Complaint (Docket No. 42).

On September 6, 2001, plaintiffs Oliver and Seaver filed a Motion to Compel (Docket No. 43) which attached a copy of plaintiffs Seaver and Brand's Request for Production of Documents. Defendants have filed a Motion to Extend Time to 11/30/01 to Respond to Request for Production of Documents (Docket No. 44). The court ALLOWED Docket No. 44 by order written on the margin.

The court issued a Procedural Order on November 9, 2001 that stated that "[a] pro se litigant cannot represent anyone other than himself. Each individual plaintiff must sign a filing if it is to be a submission of that individual plaintiff." Plaintiffs had

been making filings that were not signed by all of the plaintiffs. *See, e.g.,* Docket No. 43. The court ordered that plaintiffs resubmit certain filings (Docket Nos. 29, 40, 42 and 43) with the signatures of each plaintiff who desires that filing to be a filing in his name. On November 28, 2001, plaintiffs Seaver, Oliver, Perry, and Mercier filed a response (Docket No. 48) to the Procedural Order. The response was also signed by Henry Houghton and Deshawn Teixerea, individuals who had not signed any previous document in this case.

Included in Docket No. 48 are the following documents:

1) Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, signed by Seaver, Oliver, and Perry;

2) Reply to Defendants' Opposition to Supplement Complaint, signed by Seaver Oliver, and Perry;

3) Motion to Compel, signed by Oliver, Seaver, Perry and Mercier, with attached Request for Production of Documents signed by Seaver and Brand;

4) Motion to Supplement Complaint, signed by Oliver, Seaver, Perrier and Mercier.

Attached to Docket No. 48 was a Motion to Amend Complaint (Docket No. 47) signed by Houghton and Seaver. The attached Amended Complaint was signed by Seaver, Houghton, Oliver, Perry, Mercier and Teixera.

The court has neither previously added Houghton or Teixera nor removed Brand, Brace or Sheehan as plaintiffs from this case. The court will not permit the addition of Houghton and Teixera as the court is denying the Motion to Amend Complaint in the Order below. The Motion to Amend was the basis for the addition of Houghton and Teixera and thus because of the denial they will not be added. The court will not remove Brand, Brace, or Sheehan, since no request to do so has been filed.

## III. Factual Background

Plaintiffs, except for Larry Brand (*see* Docket No. 24), are inmates at the North Central Correctional Institution in Gardner, Massachusetts (NCCI–Gardner). Defendant Department of Corrections is an agency of the Commonwealth of Massachusetts. All of the individual defendants are corrections officers at NCCI–Gardner except for Lynn Bissonnette, who is the Superintendent of NCCI Gardner. The individual defendants are being sued in both their official and individual capacities.

Plaintiffs filed the Complaint on March 1, 2000. Plaintiffs make numerous allegations against defendants within the Complaint. These allegations are subsequently divided by plaintiffs into two causes of action. The first cause of action involves alleged discrimination by the defendants as to the plaintiffs' status as sex offenders within the prison. Plaintiffs allege in the Complaint:

22. On December 4, 1999, Defendants Rabbit, Vachon, and LeBlanc put a sign up in the office window which stated "All sex offenders should be castrated . . ."

23. On December 5, 1999, Officers John Doe and John Doe # 2 put the same sign up on the third floor of Thompson Hall Officer[s'] Bubble.

24. As a result of the sign which was put up in the windows of the officers' bubble, plaintiffs were subject to assault by other prisoners because of the nature of their crimes.

   .     .     .     .     .

39. Officer Rabbit accused Plaintiff Brace of being a "homo."

40. Officer Rabbit told Plaintiff Brace "if you want to suck dick, do it in the library."

Complaint at 5–6.

Plaintiffs make additional claims of harassment that, although not of an explicitly sexual nature, were allegedly committed against them by prison officials because of plaintiffs' status as sex offenders. *See* Complaint at 6–8. Plaintiffs also allege that plaintiff Brace complained to Lieutenant Germaine about the claims of harassment, with no actions taken by Lieutenant Germaine to remedy the situation. Plaintiffs allege that the harassment occurred from November 7, 1999 through January 27, 2000.

The second cause of action involves a visual cavity search that occurred on February 18, 2000 within NCCI–Gardner. Plaintiffs allege:

48. On February 18, 2000 the workers were called to the inmate canteen to pick up their orders.

49. While [they were] standing in line unsupervised, during a snowstorm, the officer in the tower, Corrine, hit the alarm button causing a 10–33.

50. There were around 40 inmates standing in line waiting to enter the canteen, which is an underground enclosure containing 4 rooms and a bathroom.

51. The defendants came to the point of the inmates' line in response to the 10–33 and asked the inmates "Where's the fight?"

52. Some inmates responded by stating there had been no fight.

53. After 5–6 minutes of cursory inspection, the tower guard leaned out the window and stated "I guess I was mistaken, call off the 10–33."

54. Upon hearing this, many of the inmates laughed.

55. The defendants ordered the inmates into one of the canteen rooms which measures 20 × 26 feet and conducted a visual cavity search of more than 60 inmates.

56. This visual cavity search was ordered by defendant Manduco as retaliation for the inmates' laughing at the tower guard's statement that the 10–33 was a mistake.

57. Defendant LeBlanc was present for the violation and should have ordered the officers to disperse rather than conduct a retaliatory body cavity search as she was the senior officer.

58. The civilian canteen workers were able to view the visual body cavity search from the fact that all doors were open from across the hall.

59. Officer Jones failed to secure the canteen cross-hall door which would have obstructed the civilians' view of the visual body cavity searches.

60. The defendants conducted a visual body cavity search with more than 60 inmates where there was no privacy for anyone who was subjected to the search.

.    .    .    .    .

63. The defendants forced the 60 inmates to take off all their clothes, throw them on the floor, bend over and spread their buttocks, lift their testicles, and take out their false teeth in retaliation for spontaneous laughter by one of their own staff members.

64. The defendants provided no individual areas of inspection free from the prying eyes of other officers and inmates when in fact it was not

what is known as an "emergency" situation.

Complaint at 9–11.

Except for plaintiffs' allegations about cross-hall visibility into the room where the search occurred, defendants' contentions are generally in agreement with plaintiffs' allegations as to the scope and type of strip search that occurred:

3. On February 18, 2000 at approximately 3:20 p.m. the emergency response team responded to a 10–33 alarm(disturbance), which indicated that there was a fight in progress in front of the Laurel Building in the canteen line. (LaPrise Aff. Pars. 2, 3, attached hereto as Ex. A; Compl. Par. 49.) Upon arrival of the emergency response team, there was no fight in progress. There were no inmates with apparent injuries, and none of the inmates admitted to involvement in a physical altercation. (Ex. A Par. 4; Compl. Par. 51.)

4. A strip search was conducted of all the inmates that were contained in the area. The search involved approximately 60 inmates and was conducted in a room located on the basement level, across from the canteen area. The room, which is completely enclosed with four walls, has one door, and is approximately 25 feet by 25 feet in size. The room is in close proximity to where the inmates were being contained outdoors, the room was available, the room was indoors where it was warm, the room afforded the inmates privacy while being searched, and the room allowed the search to be conducted out of view of members of the opposite sex. (Ex. A Par. 6; Compl. Par. 55.)

Docket No. 26 at 2–3.

Defendants do not agree that the purpose of the search was retaliatory, instead arguing that the search was "an attempt to determine which inmates were involved in the physical altercation" and was "ordered based upon the 10–33 alarm and the information received from Tower 1 that a fight had occurred in the canteen line." Docket No. 26 at 7.

## IV. Motion to Dismiss, or in the Alternative, for Summary Judgment

### A. Introduction

The court will first analyze issues involving the state's assertion of sovereign immunity under the Eleventh Amendment. The court will then determine whether injunctive relief is appropriate under the doctrine of *Ex Parte Young* and whether there are any grounds for declaratory relief. The court will then move to discussing the various claims of harassment and the allegedly improper visual cavity search, and determine whether qualified immunity protects the individual defendants from suit in their individual capacities.

The court emphasizes that plaintiffs are proceeding pro se and thus each individual plaintiff represents himself only. It is a matter of concern to the court that numerous filings of the plaintiffs are signed by only a few of the plaintiffs in what appears to be a representative capacity for all of the plaintiffs. The court will treat each filing as being from only those plaintiffs who signed the filing.

### B. Sovereign Immunity

The court must now consider what relief, if any, could lawfully be awarded the plaintiffs if the case does proceed to trial. Defendants raise the issue of the state's sovereign immunity under the Eleventh Amendment. Defendants argue that both "the Department, and the named de-

fendants in their official capacities, are immune from suit for any alleged deprivation of plaintiffs' rights under 42 U.S.C. § 1983." Docket No. 26 at 16. The doctrine of sovereign immunity protects the state from suits for money damages. This protection extends to state employees sued in their official capacities. *See Hawkins v. Rhode Island Lottery Commission*, 238 F.3d 112, 116 (1st Cir.2001). All claims against the defendants in their official capacities that seek relief in the form of money damages are dismissed in the Order below.

## C. Injunctive Relief

■ The state's sovereign immunity, however, does not prevent defendants from requesting injunctive relief against state employees in their official capacities, under case law originating in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and more recently extended in *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Nevertheless, the court does not find that any injunctive relief would be appropriate here as the plaintiffs state in their Complaint that the alleged acts of harassment occurred from November 7, 1999 through January 27, 2000. By plaintiffs' own admission these acts are not ongoing. Moreover, the alleged visual cavity search occurred on February 8, 2000, and no allegation has been made that this type of activity is common or may happen again in the immediate future. The court will not issue a general order that would make it more difficult for the warden legitimately to look for contraband in cases where that action is warranted. Plaintiffs have made no showing that this type of order would be necessary to protect plaintiffs' rights. Plaintiffs allegations do not state a claim entitling them to injunctive relief.

## D. Declaratory Relief

The court has power to grant declaratory relief under 28 U.S.C. § 2201, "upon the filing of an appropriate pleading." The determination as to appropriateness of declaratory relief requires an exercise of discretion. As Judge O'Toole explained:

> The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that a court "may" provide declaratory relief, but the decision to award such relief rests within the court's discretion. See *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir.1992) (noting that the Act "neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies"). "Because the Act offers a window of opportunity, not a guarantee of access, the courts, not the litigants, ultimately must determine when declaratory judgments are appropriate and when they are not." *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 534 (1st Cir.1995).

*EMC Corporation v. Roland*, 916 F.Supp. 51, 53 (D.Mass.1996)

The court concludes that plaintiffs have failed to allege a dispute for which declaratory relief would be appropriate. The court will not undertake to make a statement in the abstract about alleged rights of the parties where no showing of an ongoing controversy has been proffered. Doing so would be particularly inappropriate because of the likelihood of undermining the exercise of administrative discretion of prison officials in ways unforeseeable to this court.

The remaining claims for relief are for money damages against defendants in their individual capacities. Ordinarily a court looks first at issues of qualified immunity to determine whether money dam-

ages are recoverable. Before determining whether qualified immunity applies in these circumstances, however, the court will address whether a provision in the Prison Litigation Reform Act, namely 42 U.S.C. § 1997e(e), prevents recovery of money damages by plaintiffs.

This provision states:

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e).

The Court of Appeals for the First Circuit has not ruled on the application of this provision. A district judge in the District of Maine, however, recently explained:.

Adding the 42 U.S.C. § 1997e(e) requirement of physical injury prevents prisoners from turning every psychic trauma, no matter how deliberately inflicted, into a cause of action. The First Circuit has not had occasion to mention 42 U.S.C. § 1997e(e). However, elsewhere prisoners have seen their lawsuits fail when they alleged far more egregious conduct than does Rodriguez because of a want of physical injury. See, e.g., *Evans v. Allen*, 981 F.Supp. 1102, 1107, 1109 (N.D.Ill.1997) (bodily fluids thrown at prisoner insufficient). Rodriguez's failure to allege physical injury is fatal to any claim for damages.

*Rodriguez v. Leeman*, No. CIV. 01–72–P–C, 2001 WL 1328597 at *2 (D.Me.2001).

█ Plaintiffs seek money damages for their claims of harassment and their claim that an improper visual cavity search was conducted. The court will dismiss all claims of harassment under section 1997e(e) as being claims for emotional distress without an accompanying physical injury. The court does not make any ruling on the merits of contrasting contentions about whether discriminatory harassment occurred at NCCI–Gardner. The court also recognizes that at some point, if discriminatory harassment occurs, its nature and consequences may support claims of constitutional violations that would permit recovery of damages against defendants in their individual capacities even where no physical injury is proved. Based on the record before me, however, I hold that plaintiffs have not stated a legally cognizable claim for alleged harassment, primarily if not entirely verbal. Therefore, claims based on allegations of harassment will be dismissed in the Order below.

A more difficult question is presented, however, regarding whether section 1997e(e) independently prevents recovery of money damages for the alleged visual cavity search. First, a visual cavity search causes a physical invasion of privacy that may qualify as a physical injury for the purposes of section 1997e(e). Second, different views have been expressed about whether a claim for recovery for violation of a constitutional right is materially different from a claim for recovery for emotional or psychological distress and thus is not precluded by section 1997e(e). This issue has not yet been decided by the Court of Appeals for the First Circuit. A judge of this court, however, recently decided:

Where the harm that is constitutionally actionable is physical or emotional injury occasioned by a violation of rights, § 1997e(e) applies. In contrast, where the harm that is constitutionally actionable is the violation of intangible rights—regardless of actual physical or emotional injury—section 1997e(e) does not govern.

*Shaheed–Muhammad v. Dipaolo*, 138 F.Supp.2d 99, 107 (D.Mass.2001)(Gertner, D.J.).

It appears likely that the conducting of an unwarranted visual cavity search could be determined to be the type of rights violation that would be actionable under Judge Gertner's formulation. A visual cavity search is a very serious intrusion on any individual's privacy. The Court of Appeals for the First Circuit has held that courts must carefully consider the circumstances associated with this type of search. *See Swain v. Spinney*, 117 F.3d 1 (1st Cir.1997). Prisoners, even though incarcerated, have some degree of Fourth Amendment protection, and this protection extends to shielding prisoners from unreasonable visual cavity searches. *See Arruda v. Fair*, 710 F.2d 886 (1st Cir.1983).

It remains true, however, that section 1997e(e) does not prevent the court from issuing injunctive or declarative relief in appropriate circumstances. Thus, an avenue for addressing a potential violation of rights is available even if money damages would not be available. I conclude, then, that I should not invoke an interpretation of section 1997e(e) as the basis for dismissal of claims against defendants individually in this case. Instead, I decide on the basis of qualified immunity, as explained below.

### E. Qualified Immunity

Are defendants sued in their individual capacities in this case protected from suit for money damages by the doctrine of qualified immunity? Qualified immunity applies when a government official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have knowledge." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In determining whether this immunity is applicable here the court must look at the Complaint and determine whether the allegations are sufficient to overcome the assertion by defendants of qualified immunity. It is not sufficient for plaintiffs to show merely a mistake in judgment as qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(internal citations and quotations omitted). Moreover, any analysis of qualified immunity in this context should be done with the understanding that a court normally gives great deference to prison officials in matters of "prison safety, security and discipline." *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir.1996).

Here, beyond genuine dispute, prison officials had a reasonable justification for conducting a visual cavity search. An alarm was sounded in the prison because of what appeared to be a fight. The Court of Appeals for the First Circuit has held that in order to ensure prison security, a need exists to use visual cavity searches at certain times in order to keep out contraband. *Arruda* at 887. The search must generally be based on a reasonable suspicion that the inmate has contraband. *See Roberts v. Rhode Island*, 239 F.3d 107 (1st Cir.2001). A reasonable suspicion can be inferred in some instances without more proof, as where an inmate has met with visitors or has *committed a disciplinary infraction*. *Roberts* at 111–12. A history of high amounts of contraband in a particular prison may also be taken into account. Nevertheless, the focus of the justification inquiry is on finding contraband. The Department of Corrections' own regulation makes this connection clear in that it states:

> Strip searches should be employed, when necessary, for the close scrutiny of an inmate's person in determining if that inmate is carrying an item(s) considered to be contraband.

103 D.O.C. 506.03(1)

The Court of Appeals for the First Circuit has held that "[t]he 'touchstone' of the

qualified immunity question is the concept of 'objective legal reasonableness'." *Wood* at 927, citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In this case, the sounding of the alarm, the potential of a disciplinary infraction, and the applicable prison procedure regarding contraband, provided an objective *justification* for the prison officials' actions.

■ A dispute might be presented in this case about whether the *motivation* for the search was to find contraband, or to enforce discipline, or some other purpose (of course, the motivations may differ among defendants). Also, a suit might be presented about whether the visual cavity search could have been narrowed in order to search only those individuals most likely to have been involved in the reported fight. Nevertheless, under the applicable precedents regarding qualified immunity, I conclude that the individual defendants are protected against liability in their individual capacity because an objectively reasonable justification to perform a visual cavity search existed and thus the prison officials' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have knowledge."

### F. Supervisory Officials

■ The court must also determine whether Supervisor Bissonnette can be held liable in his individual capacity for the actions of his subordinate employees. In order to hold Superintendent Bissonnette liable, the court would have to find acquiescence or participation in a constitutional violation, or an affirmative link between the conduct of the supervisor and the employee. *See Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985). Part of the basis for a supervisor's liability is missing when no employee under his supervision is lia-

ble. Since claims against all employees of Superintendent Bissonnette are being dismissed, the claims of supervisory liability against Superintendent Bissonnette will also be dismissed.

### V. Motion to Amend Complaint

The Order below denies leave to file the Motion to Amend because it is untimely and not in the proper form. Although the court understands that plaintiffs are pro se, the court will not permit a motion that so directly is counter to its Procedural Order of November 9, 2001. The set of plaintiffs who signed the motion to amend are not the same set of plaintiffs who signed the proposed Amended Complaint. As explained earlier, no plaintiff is permitted to represent any other person. Moreover, the plaintiffs and other individuals signing the motion to amend attempt to both add and subtract plaintiffs and add defendants as well as claims in this matter without so moving and without any apparent justification.

> Concerns about management of a case in which plaintiffs are allowed to join claims arising from separate incidents each involving different parties and predominantly unrelated issues weigh heavily against exercising discretion, when any exists under the Federal Rules, to bring into one civil action such a complex array of claims and parties as results when multiple incidents involving different parties are allowed to proceed in one case.

Keeton, Judging in the American Legal System, § 16.6.4., p. 364 (1999).

Finally, the court's determination that this matter should be dismissed as a matter of law would not be altered by any of the new claims made in the amended complaint. For all these reasons, the Order below denies leave to file the Motion to Amend Complaint.

## VI. Motion to Supplement Complaint

Plaintiffs have moved to supplement complaint. The Order below denies leave to file this motion for the reasons stated in Part V, above.

## VII. Motion to Compel

The record indicates that defendants have not responded to requests for discovery by plaintiffs. As the court has decided to dismiss all claims against defendants for the reasons explained in this memorandum, the Order below dismisses the Motion to Compel as moot.

## VIII. Motion to Strike

The court will not strike defendants' Opposition to the Motion to Amend as it does not appear that any of the plaintiffs has suffered any prejudice from the delay. The court has treated the filing as a Reply.

## IX. Conclusion

In the distinctive circumstances of this case, in the exercise of discretion, I find it appropriate to leave each party to bear that party's own costs. The judgment will be for defendants, without costs.

In reaching this decision, I have not in any way relied on any assertion of fact in defendants' submissions that goes beyond facts stated in the plaintiffs' pleadings. The regulations that I have cited, though not stated in the plaintiffs' pleadings, are matters of record that do not require evidentiary submissions. In these circumstances, I rule on the defense motion (Docket No. 25) as a motion to dismiss rather than treating it as a motion for summary judgment.

### ORDER

For the foregoing reasons, it is OR-DERED:

(1) Plaintiffs' Motion to Supplement Complaint (Docket No. 40) is DENIED.

(2) Plaintiffs' Motion to Amend (Docket No. 47) is DENIED.

(3) Defendants' Motion to Dismiss (Docket No. 25) is ALLOWED.

(4) Plaintiffs' Motion to Compel (Docket No. 43) is DISMISSED as moot.

(5) Plaintiffs' Motion to Strike (Docket No. 50) is DENIED.

(6) The Clerk is directed to issue forthwith on a separate document a Final Judgment as follows:

For the reasons stated in the Opinion and Order of January 4, 2002:

Judgment for defendants, without costs.